IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

SANDRA DEXTER,              )
for Richard B. Dexter, deceased,  )
                            )
         Plaintiff,         )
                            )
v.                          )     Civil No. 10-969-DRH-CJP
                            )
MICHAEL J. ASTRUE,          )
Commissioner of Social Security, )
                            )
         Defendant.         )

# REPORT and RECOMMENDATION

**PROUD, Magistrate Judge:**

This Report and Recommendation is respectfully submitted to Chief Judge David R. Herndon pursuant to **28 U.S.C. § 636(b)(1)(B)**.

In accordance with **42 U.S.C. § 405(g)**, plaintiff Sandra Dexter, on behalf of Richard B. Dexter, deceased, seeks judicial review of the final agency decision finding that Mr. Dexter was not disabled and denying him Disability Insurance Benefits (DIB) pursuant to **42 U.S.C. § 423**.

## Procedural History

Richard B. Dexter filed an application for DIB in April, 2007, alleging disability beginning on April 7, 2005. The application was denied initially and on reconsideration. Mr. Dexter died on November 21, 2008, and his widow was substituted as claimant. (Tr. 10). After Mr. Dexter's death, a hearing was held before Administrative Law Judge (ALJ) Gerardo Mariani. ALJ Mariani denied the application for benefits in a decision dated November 4, 2009. Plaintiff's request for review was denied by the Appeals Council, and the November 4, 2009, decision became the final agency decision. (Tr. 1-5).

Plaintiff has exhausted her administrative remedies and has filed a timely complaint in

-1-

this Court.

## Issues Raised by Plaintiff

In her brief, **Doc. 19**, Mrs. Dexter raises the following issues:

(1)  The ALJ's credibility findings were not supported by substantial evidence and were legally insufficient.

(2)  The ALJ ignored a line of evidence in determining that Mr. Dexter did not have a severe mental impairment.

(3)  The Residual Functional Capacity Assessment was not supported by substantial evidence in that the ALJ failed to determine whether Mr. Dexter was limited in his ability to push/pull with his left leg.

## The Evidentiary Record

This Court has reviewed and considered the entire record in formulating this Report and Recommendation. The following is a summary of some of the pertinent portions of the written record.

**1.   Plaintiff's Testimony**

Sandra Dexter testified at the hearing. She was represented by an attorney. (Tr. 27).

According to Mrs. Dexter, her late husband was 59 years old at the time of his death. (Tr. 26). He had a high school diploma and an associate's degree. His past employment was as a truck driver. (Tr. 27). He stopped working in September, 2004, because he was he was having problems with his left leg which made it difficult for him to hold the clutch down. (Tr. 28).

At one point, Mr. Dexter was on probation for buying precursors for the production of methamphetamine. Mrs. Dexter testified that he was buying cold medicine for her. (Tr. 30). She stated that he had no drug or alcohol issues during the last few years of his life. (Tr. 30).

Mr. Dexter had problems with his back and hip such that he could not go up steps or walk even short distances. He was due to have his left hip and knee replaced. He also had carpal tunnel syndrome in his left hand and arthritis in his fingers. He was depressed. He spent

most of his time in bed, and would go two weeks without even trying to leave the house. He had trouble concentrating. He seemed to lost interest in things, and did not enjoy life anymore. (Tr. 28-30).

**2. Vocational Expert**

Randall Harding testified as a vocational expert.

Mr. Dexter's past work as an over-the-road truck driver was semi-skilled and at medium exertional level. His past work as dump truck driver was also at the medium exertional level.

The ALJ asked the witness to assume a person who could frequently lift 25 pounds and occasionally lift 50 pounds, with the ability to stand/walk 6 out of 8 hours and to sit 6 out of 8 hours. The VE testified that such a person could do Mr. Dexter's past work as a truck driver.

**3. Agency Forms**

In an Activities of Daily Living Questionnaire dated June 13, 2007, Richard Dexter said that he suffered from pain and fatigue following almost any activity, so he did very little. Even then, he suffered from "almost intolerable" pain. (Tr. 153). He said he could not sit for 2 hours, could barely get up out of sitting position, and spent most of his time in bed. (Tr. 154). He was unable to drive a truck anymore because he could not operate the clutch with his left leg and sitting caused him extreme pain. (Tr. 155).

In a questionnaire dated November 12, 2007, Mr. Dexter indicated that he had difficulty showering and only did so once a week. He said that he "rarely" left his bed. (Tr. 173). He only left home for short trips such as the grocery store or doctor appointments. (Tr. 174). He indicated that he rarely or never did any of a list of activities such as read, watch television, drive, fix things, talk on the phone, etc. (Tr. 175).

**4. Medical Treatment**

Richard Dexter received much of his health care through the Veterans Administration. He was seen in the "Green Clinic" at the Marion Veterans Administration Medical Center on

October 4, 2006. His complaints were hearing loss, blurred vision and back pain. (Tr. 232). He was noted to be depressed. (Tr. 233, 237). He was assessed as having hearing loss, blurred vision, arthritis, degenerative joint disease and spondylitis. He was offered a consult for depression and PTSD, but he refused. He was prescribed medications, including Tramadol for pain and Naproxen for arthritis. (Tr. 234-235).

His hearing was tested on October 17, 2006, and new hearing aids were ordered. (Tr. 230-231).

On March 28, 2007, further mental health evaluation indicated that Mr. Dexter did not meet the criteria for major depressive disorder. (Tr. 222). On physical exam that day, he had normal gait, no focal tenderness, no atrophy, and straight leg raising was negative on both sides. (Tr. 220). There was no clinical evidence of radiculopathy or myelopathy. Celexa was prescribed for depression. (Tr. 221). He complained of numbness in his left hand, and was given a splint for his left wrist. (Tr. 217, 219). X-rays taken on that date showed multilevel arthritic changes in the lumbar spine. (Tr. 199). X-rays of the left hip showed arthritic changes and possibly posttraumatic changes, but no definite fracture or dislocation. (Tr. 197).

On May 17, 2007, Mr. Dexter called the Marion VAMC and asked if his Hydrocodone prescription could be increased as it reduced but did not completely relieve his pain. He also requested a mental health evaluation because he was having difficulty dealing with his chronic pain. (Tr. 209).

A social worker at Marion VAMC performed a mental health consultation on October 5, 2007. Mr. Dexter complained of back pain and depression, and said that he stayed in bed for 20 hours a day. It was noted that he appeared to be having depressive episodes characterized by lack of appetite, excessive sleep, loss of enjoyment of life and limited motivation. The diagnoses were adjustment disorder with depressed emotions and history of substance abuse (cocaine and

-4-

alcohol). His GAF was assessed at 55. The treatment plan called for Mr. Dexter to attempt to get out of bed every day, shower, and begin to do small things around the house. It was noted that his physician had already increased his depression medication. (Tr. 276-278). On October 24, 2007, after review of the case "in supervision," the Axis I diagnosis was changed to dysthymic disorder, and adjusting to financial issues was added as an Axis IV diagnosis. (Tr. 280).

Mr. Dexter was also seen in the Green Clinic by Dr. Agarwal on October 5, 2007. Mr. Dexter complained of increased pain in his hands and knees, and depression. He said that he spent most of his time in bed. (Tr. 282). On physical exam, he was not in any distress. He had no focal tenderness of his musculoskeletal system. His gait was normal and he was not using an assistive device. He had no focal neurological deficit. (Tr. 282-283). Dr. Agarwal reviewed the results of an MRI which had been done in 2004. Among other findings, this test showed disc bulges at L3/4 and L4/L5 as well as near complete disc collapse with foraminal encroachment at L5/S1. A 2007 X-ray of the lumbar spine showed severe degenerative changes at L5/S1. He had a history of left hip fracture; a 2007 X-ray of the left hip showed degenerative sclerotic and possibly traumatic changes to the left hip. Mr. Dexter was already taking Vicodin for pain, and was instructed to add Neurontin for neuropathic pain. (Tr. 284).

Dr. Agarwal saw Mr. Dexter on April 7, 2008. He complained of worsening pain in his left knee and worsening depression. (Tr. 409). The physical exam was essentially normal. (Tr. 411). Dr. Agarwal noted that he was taking Vicodin for "sever[e] pain." (Tr. 412). He was noted to smoke and to have obstructive pulmonary disease findings. (Tr. 412). Mr. Dexter was 69 inches tall and weighed 194 pounds. (Tr. 413). Dr. Agarwal recommended x-rays of the knees and a referral to an orthopedic specialist. (Tr. 412).

A psychiatric consult was done at Marion VAMC on May 14, 2008. Mr. Dexter

complained that he had no interest in anything, his medications were not working, and he felt like he was just waiting to die. He stated that an orthopedic surgeon was talking about replacing his ankle, knee and hip. (Tr. 400). Mr. Dexter was oriented and his memory and concentration were intact. He claimed to have auditory hallucinations. His insight and judgment were appropriate. The motivation for treatment was that his primary care doctor "said that he couldn't write anything stronger." (Tr. 403). The Axis I diagnosis was major depression, chronic. He was instructed to increase his dosage of citalopram (Celexa). (Tr. 404).

The next month, a mental health assessment at Marion VAMC indicated that Mr. Dexter continued to be depressed. His recent memory, concentration and attention span were impaired. He was out of bed only two hours a day due to back and leg pain. (Tr. 394).

An MRI of the lumbar spine on June 23, 2008, showed severe degenerative disc disease and protruding disc at L1/L2 and L5/S1, spinal stenosis of L2/L3 and L3/L4, and right neural foraminal stenosis of L4/L5. (Tr. 373-374). On the same date, x-rays of the knees showed joint space narrowing, spurring and degenerative changes, worse on the left. (Tr. 378-379).

An orthopedic specialist, Dr. Richard Morgan, saw plaintiff on a referral from the VAMC on August 5, 2008. Dr. Morgan diagnosed significant medial compartment collapse of the left knee, and recommended Supartz.[1] Dr. Morgan noted that Mr. Dexter was "a bit young" to undergo a total knee replacement, and that he was "also looking at some spine surgery at some point." (Tr. 434).

Mr. Dexter presented to the emergency room at Union County Hospital on November 17, 2008, with chest pain and respiratory distress. He was transferred to Southeast Missouri

---

[1]Supartz is a drug which is injected into the knee joint, intended to provide long-term relief of pain caused by osteoarthritis. See, http://www.medilexicon.com/drugs/supartz.php, last accessed on June 6, 2011.

Hospital. (Tr. 343-348). There, he was diagnosed with pneumonia and MRSA. He died of septic shock on November 21, 2008. (Tr. 294-295).

**5.     Consultative Examinations**

Dr. Adrian Feinerman performed a physical examination on August 27, 2007. (Tr. 240-244). Mr. Dexter complained of back pain radiating to the left leg. He said that his back pain began after a motor vehicle accident in 1979. He reported no psychiatric history. (Tr. 241). On physical examination, he had no limitation of motion of the spine or of any joint. He was able to walk 50 feet and to get on and off the examination table without assistance. He could tandem walk, walk on heels and toes, squat and rise from a chair with no difficulty. Muscle strength was normal throughout, with no spasm or atrophy. Fine and gross manipulation were intact. Straight leg raising was negative. Memory, concentration and ability to relate were all normal. (Tr. 243).

On that same date, Harry Deppe, Ph.D., performed a consultative psychological examination. (Tr. 245-248). Mr. Dexter stated that he was seeking disability because he had "a lot of back pain." He initially denied using drugs in the past 30 years, but later corrected himself, stating, "Oh, I forgot about that methamphetamine stuff." He then told Dr. Deppe that he had used methamphetamine "for a little bit" about six months previously, and had been arrested. He was placed on probation. At the time of his examination with Dr. Deppe, he was undergoing outpatient treatment for substance abuse at Fellowship House in Anna, Illinois, as part of his probation. (Tr. 245-246). Mr. Dexter told Dr. Deppe that he was not receiving mental health treatment except for the substance abuse treatment. On examination, Mr. Dexter's mood and affect were within normal limits. His grooming and hygiene were adequate. He had no difficulty hearing. He had no formal thought disorders, and no difficulty staying on task. His responses were coherent and relevant. He was oriented. His memory was intact for both recent and remote events. His judgment and insight were adequate. With respect to daily activities,

Mr. Dexter said that he sees one of his friends, sleeps a lot and watches TV. Dr. Deppe's clinical impressions were that Mr. Dexter had only fair ability to relate to others and to withstand the stresses and pressures of day-to-day work, and had intact ability to understand and follow simple instructions and to maintain attention required to perform simple, repetitive tasks. Dr. Deppe rated his prognosis as "fair at best." (Tr. 247-248). The Axis I diagnoses were methamphetamine abuse, in partial remission, and adjustment disorder with anxious mood. The Axis II diagnosis was personality disorder, not otherwise specified. He assessed a GAF of 50-60.

**6.    RFC Evaluations**

On September 13, 2007, a state agency physician evaluated plaintiff's RFC, and concluded that he could frequently lift 25 pounds, occasionally lift 50 pounds, stand or walk for 6 out of 8 hours, sit with normal breaks for 6 out of 8 hours, and had no push/pull limitations. She also found that plaintiff had no postural, manipulative, visual, communicative or environmental limitations. (Tr. 263-270).

**7.    Psychiatric Review Technique**

A Psychiatric Review Technique form was completed by Margaret Wharton, PsyD, on September 9, 2007. (Tr. 249-262). Dr. Wharton concluded that plaintiff did not have a severe mental impairment. She noted that Mr. Dexter had adjustment disorder with anxious mood and personality disorder not otherwise specified. She found that plaintiff had only mild limitations in activities of daily living, social functioning and maintaining concentration, persistence or pace. The remarks in the "consultant's notes" section of the form indicate that Dr. Wharton relied on Dr. Deppe's evaluation in formulating her analysis. (Tr. 261).

**Applicable Standards**

To qualify for social security disability benefits, a claimant must be disabled within the

meaning of the applicable statutes.  For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." **42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A).**  A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.  **42 U.S.C. §§ 423(d)(3) and 1382c(a)(3)(C).**

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled.  In essence, it must be determined (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is severe; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience.  **See,** *Schroeter v. Sullivan***, 977 F.2d 391, 393 (7th Cir. 1992);** *Pope v. Shalala***, 998 F.2d 473, 477 (7th Cir. 1993); 20 C.F.R. § 404.1520(b-f).**

If the Commissioner finds that the claimant has an impairment which is severe and he is not capable of performing his past relevant work, the burden shifts to the Commissioner to show that there are a significant number of jobs in the economy that claimant is capable of performing.  **See,** *Bowen v. Yuckert***, 482 U.S. 137, 146, 107 S. Ct. 2287, 2294 (1987);** *Knight v. Chater***, 55 F.3d 309, 313 (7th Cir. 1995).**

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made.   The scope of review is limited.  "The findings of the Commissioner of Social Security as to any fact, if supported by substantial

evidence, shall be conclusive. . . ." **42 U.S.C. § 405(g)**. Thus, this Court must determine not whether Mr. Dexter was, in fact, disabled, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. **See,** ***Books v. Chater*****, 91 F.3d 972, 977-78 (7th Cir. 1996)** (citing ***Diaz v. Chater*****, 55 F.3d 300, 306 (7th Cir. 1995)**). This Court uses the Supreme Court's definition of substantial evidence, i.e, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." ***Richard v. Perales*****, 402 U.S. 389, 401 (1971).**

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. ***Brewer v. Chater*****, 103 F.3d 1384, 1390 (7th Cir. 1997)**. However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. See, ***Parker v. Astrue*****, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.**

## Analysis

Here, the ALJ properly followed the five step analysis. He concluded that Mr. Dexter had severe impairments of degenerative disc disease of the lumbar spine, cervical spondylosis, posttraumatic changes of the left hip status post fracture, and degenerative changes of both knees. With regard to mental impairments, the ALJ noted that plaintiff had been assigned various diagnoses, including adjustment disorder with depressed emotions and adjustment disorder with anxious mood, but concluded that these impairments were not severe. In making this determination, the ALJ focused on Dr. Deppe's consultative exam, and did not mention the mental health treatment received by Mr. Dexter after October, 2007. (Tr. 12-15).

The ALJ afforded significant weight to the opinions of Dr. Feinerman and the state agency physician, and concluded that plaintiff has the RFC to perform the full range of work at a

medium level of exertion in that he can lift or carry no more than 50 pounds occasionally and 25 pounds frequently, and sit, stand or walk for 6 out of 8 hours. (Tr. 15). The ALJ found that Mr. Dexter's statements about the intensity, duration, and limiting effects of his symptoms were not credible to the extent that they conflicted with the RFC findings. (Tr. 17).

In accordance with the testimony of the vocational expert, the ALJ found that Mr. Dexter was able to perform his past work as an over-the-road truck driver and a dump truck driver. (Tr. 18).

Plaintiff's first point is that the ALJ's credibility determination was not supported by substantial evidence. He is correct.

ALJ Mariani found that "the claimant's medically determinable impairments could reasonably be expected to produce some of the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the residual functional capacity assessment outlined above." (Tr. 17).

The Seventh Circuit criticized similar language in *Parker v. Astrue*, **597 F.3d 920, 921-922 (7th Cir. 2010)**, stating that "It is not only boilerplate; it is meaningless boilerplate." As in *Parker*, the ALJ's analysis is meaningless because it does not communicate what weight he gave to Mr. Dexter's statements. Further, it is unclear what statements he is referring to. This case is somewhat unusual in that Mr. Dexter died before the hearing.[2] However, the record contains statements made by him in agency forms, to health care providers, and to examining doctors. The ALJ does not specify which statements he considered and found to be not credible. Such an

---

[2] Mrs. Dexter did testify at the hearing, and, logically, the ALJ must have found her testimony to have been not credible as well, but he did not mention her testimony at all.

-11-

analysis is inadequate. See, ***Martinez v. Astrue***, **630 F.3d 693, 694-696 (7th Cir. 2011);** ***Spivey v. Astrue***, **628 F. 3d 346, 348 (7th Cir. 2010)**.

It is also problematic that the ALJ rejected Mr. Dexter's statements to the extent that they did not mesh with his findings as to RFC. This approach "turns the credibility determination process on its head by finding statements that support the ruling credible and rejecting those statements that do not, rather than evaluating the [claimant's] credibility as an initial matter in order to come to a decision on the merits." ***Brindisi v. Barnhart***, **315 F.3d 783, 787-788 (7th Cir. 2003)**.

This Court is not suggesting that the ALJ's use of the above boilerplate language is necessarily fatal. The ALJ's decision might pass muster had he gone on to support his credibility findings with a sufficient articulation of how the record contradicts the claimant's statements. ALJ Mariani did not do so here.

ALJ Mariani supported his credibility findings by saying, first, that the degree of limitation claimed was not supported by the objective medical record, and secondly, that Mr. Dexter's claim of disabling depression was not supported by Dr. Deppe's findings. (Tr. 17). Dr. Deppe's examination took place in August, 2007. The ALJ mentioned at Tr. 13 that Mr. Dexter was diagnosed with adjustment disorder with depressed emotions and substance abuse in October, 2007. (Actually, the diagnosis was *history of* substance abuse, not present substance abuse. See, Tr. 421). However, the ALJ did not discuss at all the mental health treatment which took place thereafter. The ALJ must "confront evidence that does not support his conclusion and explain why it was rejected." ***Indoranto v. Barnhart***, **374 F.3d 470, 474 (7th Cir. 2004).** The failure to discuss a significant part of Mr. Dexter's mental health treatment further undermines the credibility findings.

Plaintiff also takes issue with the finding that Mr. Dexter did not have a severe mental

impairment. This finding is not supported by substantial evidence because the ALJ failed to consider the evidence of mental health treatment after October, 2007. The ALJ was, of course, not required to mention every piece of evidence. **Dixon v. Massanari, 270 F.3d 1171, 1176 (7th Cir. 2001)**. However, he cannot simply ignore a line of evidence that contradicts his conclusions. **Indoranto, id**.; **Zurawski v. Halter, 245 F.3d 881, 888 (7th Cir. 2001).**

Defendant admits that the ALJ did not discuss the mental health treatment after October, 2007, but he argues that those records "do not demonstrate a greater degree of limitation than the ALJ found." Doc. 21, p. 8. This argument misses the mark. While the evidence of later treatment does not compel a finding that Mr. Dexter had a severe mental impairment, it could certainly support such a finding. The ALJ's decision can only be defended on grounds relied upon by the ALJ. **Larson v. Astrue, 615 F.3d 744, 749 (7th Cir. 2010)**. It is impossible to know how the ALJ viewed the later mental health treatment, since he never mentioned it. This Court cannot substitute its own view of this evidence (or the view of defense counsel) for that of the ALJ.

Lastly, plaintiff argues that the ALJ erred in failing to make a finding regarding his ability to push/pull with his left leg as part of his RFC determination. The ability to push/pull (with arms and legs) is one of the seven strength demands that make up exertional capacity. SSR96-8p, *5. "The RFC assessment must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence." SSR96-8p, *7.

The Seventh Circuit has held that an ALJ is not always required to set forth a narrative discussion of each and every work-related function: "an ALJ need not provide superfluous analysis of irrelevant limitations or relevant limitations about which there is no conflicting medical evidence." **Zatz v. Astrue, 346 Fed. Appx. 107, 111 (7th Cir. 2009).**

Here, the ALJ concluded that Mr. Dexter had the RFC to perform his past work as a truck driver. Both Mr. and Mrs. Dexter stated that Mr. Dexter had stopped working as a truck driver because he had difficulty operating the clutch with his left leg. See, Tr. 28, 155. Thus, the ability to push/pull with the left leg was a relevant limitation. The ALJ found that Mr. Dexter had degenerative changes in his knees, and that this was a severe impairment. (Tr. 12). He did not, however, explicitly discuss whether Mr. Dexter had any limitation in the push/pull function as part of his RFC analysis.

Defendant argues that the ALJ implicitly found that Mr. Dexter did not have any limitation in his ability to push/pull with his left leg, and that the medical records do not support a finding of such a limitation. However, the ALJ failed to mention Dr. Morgan's diagnosis of significant medial compartment collapse of the left knee, and his treatment of Mr. Dexter's left knee with Supartz injections in 2008. In view of the direct relevance of the claimed limitation to his ability to drive a truck, it was error to fail to consider this evidence and to determine the degree of limitation, if any, of Mr. Dexter's ability to push/pull with his left leg.

The ALJ's decision is the product of errors, and should be remanded for reconsideration. It should be noted that this Court is not making any suggestion as to whether Mr. Dexter was, in fact, disabled, or as to what the ALJ's decision should be on reconsideration.

Remand of a social security case can be ordered pursuant to sentence four or sentence six of 42 U.S.C. § 405(g). A sentence four remand depends upon a finding of error, and is itself a final, appealable order. In contrast, a sentence six remand is for the purpose of receipt of new evidence, but does not determine whether the Commissioner's decision as rendered was correct. A sentence six remand is not an appealable order. **See, *Perlman v. Swiss Bank Corporation Comprehensive Disability Protection Plan*, 195 F.3d 975, 978 (7th Cir. 1999).**

Here, a sentence four remand is appropriate.

**<u>Recommendation</u>**

This Court recommends that the Commissioner's final decision be **REVERSED and REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of **42 U.S.C. §405(g).**

Objections to this Report and Recommendation must be filed on or before **June 27, 2011.**

**Submitted:  June 8, 2011.**

**s/ Clifford J. Proud**
**CLIFFORD J. PROUD**
**UNITED STATES MAGISTRATE JUDGE**
